1  SPENCER F. SMITH, ESQ. (SBN: 236587)
   DOW W. PATTEN, ESQ., (SBN:135931)
   SMITH PATTEN
2  353 Sacramento St., Suite 1120
   San Francisco, California 94111
3  Telephone (415) 402-0084
   Facsimile (415) 520-0104
4
   Attorney for Plaintiff
5  CHRISTOPHER SURBEY

6

7                    UNITED STATES DISTRICT COURT

8         FOR THE NORTHERN DISTRICT OF CALIFORNIA      **LB**

9

10  CHRISTOPHER SURBEY, an individual,     Case No.: **13   2402**

11                                          )   **COMPLAINT**
                                            )
12              Plaintiff,                   )
                                            )   **1) RETALIATION IN VIOLATION OF
13        v.                                 )   THE SARBANES-OXLEY ACT OF 2002;**
                                            )
14                                          )   **2) WRONGFUL TERMINATION IN
    PACIFIC GAS & ELECTRIC COMPANY,          )   VIOLATION OF PUBLIC POLICY**
15  PACIFIC GAS & ELECTRIC                   )
    CORPORATION, and DOES 1-10,             )
16                                          )
                                            )
17              Defendants.                  )
                                            )
18                                          )

19

20        Comes now Plaintiff, CHRISTOPHER SURBEY ("SURBEY") and complains of

21  Defendants as follows:

22                              **PARTIES**

23
24  1.    Plaintiff is an individual and resident of the State of California, and was at all relevant

25  times herein employed by Defendants PG&E CORPORATION, and PACIFIC GAS &

26  ELECTRIC COMPANY (collectively "PG&E").

27

28

                                        1

COMPLAINT

2. Defendant PG&E CORPORATION is a California Corporation, organized and existing under the laws of the State of California, and was at all relevant times herein the employer of Plaintiff.

3. Defendant PACIFIC GAS & ELECTRIC COMPANY is a California Corporation, organized and existing under the laws of the State of California, and was at all relevant times herein the employer of Plaintiff.

4. Plaintiff is ignorant of the true names and capacities of defendants sued herein as DOES 1-10, inclusive, and Plaintiff therefore sue such defendants by such fictitious names. Plaintiff will amend this complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes and thereon alleges that each of these fictitiously named defendants is responsible in some manner for the occurrences, acts and omissions alleged herein and that Plaintiffs' injuries as alleged herein were proximately caused by such aforementioned defendants.

5. Plaintiff is informed and believes and thereon alleges that at all times mentioned herein, each of the defendants was acting as the partner, agent, servant, and employee of each remaining defendants, and in doing the things alleged herein was acting within the course and scope of such agency and with the knowledge of the remaining defendants, and that each defendant is responsible for the occurrences, acts and omissions of each other defendant complained of herein.

## JURISDICTION

6. This Court has jurisdiction over this matter based upon, the federal question of the Sarbanes-Oxley Whistleblower provisions of 18 U.S.C. § 1514A and pendent jurisdiction over Plaintiff's state law claims for violations of the California Fair Employment and Housing Act (the "FEHA").

2

COMPLAINT

7.      The amount in controversy exceeds the jurisdictional limit of this Court.

**VENUE**

8.      Venue is proper in this district pursuant to 28 U.S.C. §1391(a).

**EXHAUSTION**

9.      In or about May 7, 2012, Plaintiff filed a formal complaint with the Department of Labor, Occupational Safety and Health Administration alleging retaliation in violation of the whistleblowing provisions of the Sarbanes Oxley Act of 2002, which was assigned case number 9-3290-12-078.

10.     More than 180 days have elapsed since the filing of SURBEY's DOL Complaint, with no findings being made by the Assistant Secretary of the Department of Labor, nor decision made by an Administrative Law Judge, and the delay is not due to any act or omission of Plaintiff SURBEY.

**GENERAL ALLEGATIONS**

12.     Defendant PG&E CORP. is a publicly traded company with one or more classes of securities registered under Section 12 of the Securities and Exchange act of 1934 and/or is required to file reports under section 15(d) of the Securities and Exchange Act of 1934, and is subject to the provisions of the Sarbanes-Oxley Act of 2002 ("SOX").

13.     Defendant PACIFIC GAS & ELECTRIC COMPANY is a privately held utility and a subsidiary of PG&E CORP., with over 4 million gas customers and 4.8 million electric customers in Northern and Central California.

14.     SURBEY is a former Principal Project Manager of GIS for Pacific Gas and Electric Company ("PG&E") who was hired in February of 2011 to help the beleaguered utility company remediate its geographic information systems ("GIS") data after the San Bruno explosion in

3

2010.  As a 20-year veteran project manager and a specialist in GIS for gas and electric utilities,

SURBEY's rare expertise was a valuable addition to PG&E's team of managers for the GIS

projects, few of whom had any GIS experience at all.

15.     PG&E hired SURBEY to remedy a critical deficiency in GIS competence at PG&E.

Multiple regulatory filings demonstrate that PG&E's GIS data is and has been dangerously

inaccurate and incomplete for many years, and that its technology and storage systems were

grossly insufficient to provide the utility and the PG&E CORP. with reliable safety and security

information and that this state persists today, as of the filing of this Complaint.

16.     The critical deficiencies in GIS competence at PG&E predated SURBEY's employment

for many years.  For example, in 2009, the California Public Utilities Commission ("PUC")

approved an $85 million Base GIS program that was proffered by Defendants to the public at

large and to the PUC as an overhaul of PG&E's critical GIS data, which includes location and

other information on electric and natural gas infrastructure, and is crucial to preventing disasters

like the San Bruno explosion.

17.     Since the 2010 San Bruno explosion, PG&E faced harsh criticism, fines, intensified

oversight by the PUC, and an investigation by the National Transportation and Safety Board

("NTSB").

18.     The 2010 San Bruno explosion started when a 30-inch underground gas pipe installed in

1956 ruptured, releasing a large quantity of natural gas that ignited.  The explosion and

subsequent investigation revealed that, among other serious oversights,  PG&E was unaware of

vital information about the pipe because of its outdated information systems and error-ridden

data.  Information about the pipe should have been available at the click of a mouse as part of

any industry-standard pipeline GIS implementation.  PG&E's system limitations resulted in a

4

lack of proper maintenance, and caused delays in pinpointing the location of the break, prolonging the release of gas and fueling the fire.

19.     PG&E began using GIS data in 1993 to manage its more than 6,000 miles of pipeline. In attempting to move towards an industry-standard GIS system, PG&E transferred data from paper records and maps, some of which were decades old, into computers in order to make vital information more readily available. Due to cost cutting, much of the critical facilities such as pipe welds were left out of PG&E's GIS.

20.     Since beginning to use GIS data in 1993, PG&E has fallen dangerously far behind the rest of the utility industry in utilizing technology to maintain usable and accurate GIS data.

21.     For many years preceding the 2010 San Bruno explosion, PG&E has long known that its error-ridden GIS data, its negligent storage, its failure to update or confirm records and maps, and its outdated GIS technology has created a dangerously defective GIS implementation at PG&E.

22.     In its 2008 General Rate Case, PG&E requested a budget of $85 million from the California Public Utilities Commission to fund its so-called Base GIS program, which purported to overhaul the GIS data and technology at PG&E across departments. Despite the public statements made by PG&E concerning the "Base GIS" system, most employees and managers at PG&E knew from the beginning that "Base GIS" would never achieve its exaggerated goals, but PG&E presented it to the public, the CPUC, and the market anyway.

23.     On September 9, 2010, a PG&E gas distribution pipe caused an explosion in San Bruno, killing eight people. The NTSB's investigation revealed that PG&E's GIS data systems, records, and actual data were dangerously inadequate. Because PG&E made little effort to ensure that the data entered into the GIS system accurately reflected its paper records, an incomplete data set

5

made its way into the original GIS system in 1993. Those errors were never corrected, and when system upgrades were implemented by PG&E and its consultants, other technologically-related problems arose. ESRI's software from 2006 crashed and was never operational. There were also issues with bandwidth capacity that prevented data from being saved. With the inaccurate data and technology operating at a much more primitive level than PG&E's peers and far less than the the software is capable of, PG&E had no accurate records on its own pipelines, in violation of law.

24.     The San Bruno explosion halted progress on Base GIS after PG&E had spent approximately $22 million on contracts on consultancies, yet achieving no progress on a usable system. PG&E broke the GIS overhaul into four Asset Management projects, each covering a specific type of PG&E property: gas transmission pipes (large-scale pipes transporting gas from the source to a specific area), gas distribution pipes (small-scale pipes distributing gas from a general area to individual sites, such as apartment buildings), electric transmission (large-scale transmission from the source to a general area), and electric distribution (small-scale distribution from a general area to individual sites). These projects were to be handled separately and were called gas transmission asset management (GTAM), gas distribution asset management (GDAM), electric transmission asset management (ETAM), and electric distribution asset management (EDAM). Together, the asset management projects were projected to cost approximately $300 million.

25.     PG&E also formulated a plan called Pipeline 2020, which was later called the Pipeline Safety Enhancement Program ("PSEP"), as a response to the San Bruno disaster. PG&E forecasted costs of $123.6 million for the GTAM project alone, and proffered to the PUC that 2011 expenses and capital related costs had been funded by shareholders. However, $2 million

6

of the $7.9 million in 2011 GTAM costs were actually funded by the Base GIS program, some of which contributed to $1 million per month on food catering for the consultancy staff. Further, PG&E would not break down the imputed adopted and recorded amounts spent on software, hardware, data conversion, and implementation. PG&E did not explain how it was spending money pursuant to budget numbers authorized by the PUC – numbers authorized because of the clear need for a functioning GIS that it had promised shareholders and the CPUC years prior.

26.   PG&E forecasted that $10.1 million of the budget for the PSEP was needed for GTAM software. In September 2011, the PUC requested that PG&E explain why PG&E's authorized funding levels in its 2011 General Rate Case, which included funding for software, was insufficient to address its GTAM activities. PG&E responded that new software investments will be required because PG&E had decided to "rebuild" its GT GIS with a new model now considered to be the best practice in the industry. The breakdown of this budget addition was comprised of licenses and implementation that would be paid out to Consultancies but never implemented.

27.   PG&E hired SURBEY as part of a desperately-needed push to acquire GIS-experienced employees. When PG&E recruited Plaintiff, it had the largest GIS project in North America for the next five years but few, if any, of its project managers had GIS knowledge. An independent panel of experts commissioned by the PUC issued a report in June 2011 about PG&E's flawed response plans to the San Bruno disaster. One of those flaws was that PG&E was understaffed, undertrained, and too generalist; it did not employ enough senior people with technical backgrounds and experience in gas systems especially.

28.   Shortly after the 2010 San Bruno explosion,  SURBEY interviewed with Director and Senior Director of the Project Management Office, Alain Erdazaincy and Robert Veenaman, in

7

COMPLAINT

December 2010. Alain Erdazaincy and Robert Veenaman represented to SURBEY that PG&E was committed to building an industry leading program, and that in light of SURBEY's GIS expertise and project management experience, he would be a long-term part of its development. When SURBEY met with his future superior, Director (later Senior Director) Marianne Dickerson in January 2011, Dickerson specifically asked if SURBEY knew gas systems GIS. Plaintiff replied that he had worked on several gas GIS projects at British Petroleum and the Olympic Pipeline Company. She said, "good," and wished SURBEY luck.

29. SURBEY is a seasoned professional in Geographic Information Systems ("GIS") management at major utilities. For over 20 years he has successfully led gas and electric GIS projects as a program manager, practice lead for GIS, and an information technology ("IT") consultant at leading utilities and corporations. SURBEY is one of the few GIS managers in the electric and gas utility industry with both IT and field operations experience.

30. SURBEY's accomplished career armed him with the necessary skills and knowledge of the necessary steps to successfully deploy large scale GIS technology programs at utilities. SURBEY's skill set as a GIS program deployment specialist, with expertise in both IT and management, has made SURBEY uniquely qualified among utility companies implementing GIS programs crucial to public safety.

31. After studying GIS during graduate school at San Diego State University, SURBEY began his career as a GIS professional in 1989 at ESRI, Inc., the utility industry's leading software provider.

32. From ESRI, SURBEY was recruited to lead the Southern California Edison ("Edison") GIS deployment. Under his leadership, the GIS group at Edison grew from a departmental focus with a three-person GIS team to a 20-person team supporting multiple departments at Edison

8

including Customer Service, Electric Transmission Planning, Environmental Analysis,

Regulatory Affairs, and Land Services. At Edison, SURBEY's team provided industry-leading

analytics in support of system capacity planning and one of the first Telecom GIS network

programs. Edison's GIS system won numerous electric utility GIS industry awards for advanced

technology programs. At Edison, SURBEY succeeded in bridging the technology gap with

business users through collaboration of resources and business needs, provided project

management, and managed large teams of employees.

33.     SURBEY managed a similarly sized team at the Metropolitan Water District (MWD) in

Los Angeles. At MWD, SURBEY successfully migrated the GIS team from the Planning

department to the IT Department where it supported the entire enterprise, requiring executive and

director level coordination.

34.     From 2001 to 2008, SURBEY worked on a variety of GIS/IT consulting projects

including the deployment of a large GIS program for City of Las Vegas Airports.

35.     Immediately prior to joining PG&E, SURBEY transitioned into the Smart Meter field,

providing project leadership at the nation's largest municipal utility, CPS Energy in San Antonio,

from 2008 to February 2011. At CPS Energy SURBEY gained field experience and provided

project level leadership for a team comprised of IT specialists, Customer Service, RF Engineers,

meter reading analysts, and electric and gas field technicians. In this role, SURBEY brought his

utility industry experience and knowledge of GIS to improve deployment strategies for smart

meters based on multiple constituent needs.

36.     SURBEY was recruited by PG&E and began work in February 2011 as a Project

Manager, Principal CIT specifically to manage delivery of large scale GIS projects. At PG&E

9

SURBEY's job focus was in large scale electric and gas utility programs using the ESRI software platform.

37.     At the time of his hiring at PG&E, SURBEY was one of the first managers with a successful track record of GIS deployments ever hired at PG&E.

38.     At the time of his hiring at PG&E, SURBEY had competing offers from CPS Energy, the country's largest municipal utility and Plaintiff's employer at the time, and from Los Angeles Water & Power to manage smart meter deployment in Los Angeles. Plaintiff chose to join PG&E because he believed he would have the opportunity to lead large multi-year GIS projects. Pursuant to PG&E's representations to SURBEY during his recruitment and to the public, PG&E was scheduled to complete the largest GIS project in North America over the next five years, and Plaintiff was enthusiastic about helping to build an industry leading program.

39.     Plaintiff began working at PG&E on February 14, 2011 in the IT Project Management Office ("PMO") to manage the corporate enterprise GIS effort, with general responsibility to manage the deployment of GIS programs.

40.     SURBEY's first task in his employment with PG&E was to manage the Gas Transmission ("GT") GIS software upgrade, from version 1.0 to version 2.0. PG&E's IT Department's previous four efforts at the upgrading its five-year-old ESRI GIS software had failed. By April 2011, the GT business and IT departments debated canceling the upgrade because of projections that a newer version would be available in 2012. SURBEY wrote a position paper weighing the options and advocating in favor of continuing the current effort because it would provide significant security enhancements for the GT data.   This a standard protocol at PG&E. Rather than complete projects, promise to deliver more for the upcoming "newer version".

COMPLAINT

Unfortunately, the cycle never ends and PG&E is left without the technology necessary to safely perform the functions of safely delivering energy to its ratepayers.

41.    SURBEY succeeded in his GT GIS upgrade efforts and the project went live in July 2011. This was the first successful GIS deployment by PG&E's IT department. For this achievement, SURBEY received a Rewards and Recognition, a $5,000 lump sum award, and the project received numerous letters of commendation from high level managers in the Gas Operations Department. In May 2011, SURBEY became PG&E's lead on Asset Management projects and worked with a team including IBM, ESRI, Telvent and Vestra.

42.    In May 2011, when the GT GIS upgrade project was still underway, Director of IT Client Delivery Marianne Dickerson told SURBEY that he needed to choose between working on GT and working on the Recalibration Planning work that was beginning, which SURBEY had also been handling. SURBEY had teamed up with another IT lead on both projects, but IBM consultants complained to Dickerson, who was a recently-hired former IBM employee, that it did not want to deal with two IT leads on the GT GIS project. At the time, Dickerson told SURBEY that leading the IBM/ESRI consulting team would be a better career opportunity.

43.    In June 2011, SURBEY worked more heavily on the Recalibration Planning project while also leading the overall effort to achieve enterprise GIS at PG&E. In July 2011, PG&E dismantled the Project Management Office and SURBEY continued his work as PG&E's lead GIS project manager under now-Senior Director Dickerson.

44.    In August 2011, Dickerson encouraged SURBEY to post for the Electric or Gas Director positions that were becoming available in October and that he could "have his choice," especially since SURBEY had been acting in the Director role and continued to do so until December 2011.

11

COMPLAINT

45.     In August 2011, SURBEY told Dickerson that the charges for GTAM contracts did not belong in the charges to Base GIS. Dickerson told SURBEY that it was the "intent" of Base GIS to include GTAM expenses; however, Base GIS was funded by PG&E stockholders and began before GTAM had even been created. GTAM was part of the General Rate Case later approved by the PUC, to be funded by ratepayers, and was never budgeted, planned, or scheduled as part of Base GIS.

46.     By this time, now Senior Director Dickerson placed enormous pressure on SURBEY to complete all of the GIS Recalibration plans on unrealistic time schedules. Despite the limitations of the business and IT departments of Electric Operations caused by the IT reorganization, SURBEY was able to complete the plans for the ED project by October 2011. The business case SURBEY worked on was approved. He continued to act, based on his responsibilities, as the director of ED, ET, and GD GIS Asset Management projects.

47.     In October 2011, SURBEY applied for the ED and GD GIS Director positions.

48.     PG&E continued to emphasize its great need for employees knowledgeable in GIS throughout Plaintiff's employment at the company. After layoffs of IT personnel (approximately 200 people) in October 2011, some of SURBEY's co-workers and colleagues at PG&E became concerned about their job security. However, at several team meetings throughout October 2011, Dickerson stated that no one in the company with a GIS background had to worry about their job. At one meeting, Dickerson even stated that PG&E was in such dire need of GIS professionals that anyone who could spell GIS had a job for the foreseeable future.

49.     Starting in October 2011, SURBEY became responsible for some major financial aspects of managing PG&E's GIS projects. SURBEY was required to create budget forecasts to close the Base GIS project and develop the new ED GIS Proof of Concept and to complete the 2012

12

budget plans for Gas Distribution and Electric Distribution GIS in early November. When budgeting resources, SURBEY was told to put himself in as the budget resource for Electric Distribution Asset Management Project Manager and as the placeholder for the Project Manager for Gas Distribution Asset Management.

50.     In October 2011, Dickerson laid out an aggressive timeline for the ED system integration. SURBEY asked Dickerson whether he ought to start the request for proposal ("RFP") process soon. PG&E is required to follow the proper procurement process to give vendors a fair chance to bid on the project. Putting a proposal together ordinarily takes approximately six months and can cost a vendor hundreds of thousands of dollars. The ED system integration project procurement, however, was, consistent with PG&E's pattern and practice of creating system requirements tailored to IBM's particular service offerings. IBM and ESRI had already been involved in the setup of the ED Asset Management system integration, and it was clear that no other vendor could respond in a competitive way since no other vendor had knowledge of the proof of concept effort for the Electrical Distribution GIS. Dickerson, a former IBM consultant, told SURBEY to hold off on the RFP process because she was going to attempt to avoid the RFP process altogether.

51.     In mid-November 2011, Dickerson suddenly demanded that SURBEY conduct the RFP and have bids by the end of the year. SURBEY expressed concern to Stephen Murley that SURBEY was not going to be able to perform the necessary due diligence required by the process in only six weeks. SURBEY also told Dickerson that this RFP was a sham. Dickerson agreed, but told him that this was the only way to get the IBM deal done since IBM was offering a "discount" on the contract if it was approved before the end of 2011.

13

52.     In the same time period, Dickerson hired Susanne Martin, consistent with the revolving-door pattern from a Consultancy: ESRI (a subsidiary of IBM). Martin was hired as the Director of the ED GIS program and was reviewing the RFP proposals from IBM and Wipro. Martin had worked on the ED system integration plan as part of the ESRI-IBM team that put together the requirements for the project prior to sending the project out for bidding. In early December, Dickerson sent emails to the IT Department indicating that Martin would be taking a leadership role on the ED Asset Management system project and would be "heavily involved" in the contract negotiations and procurement. PG&E staff including Martin negotiated the contract with IBM during the last week of December 2011 when SURBEY was on vacation.

53.     Towards the end of 2011, PG&E told SURBEY to purchase as much computer equipment as possible for all of the GIS projects in order to help the 2012 budgets. IT Business Finance told SURBEY that the Base GIS program was underspent by $3 million.

54.     During the last week of December 2011, while SURBEY was on vacation, several accounting accruals for services performed by consultants needed to be approved. SURBEY tried to contact Tim Mathews, who was responsible for project accounting, but he was on vacation and had announced he was leaving for another department. Even though the ESRI license was administered by another PG&E employee, one of these accruals was for an ESRI license, which had accrued in the amount of $1.4 million. In January, the number changed to $1.3 million and $500,000 was going to be distributed to other GIS projects. Other consultants that worked on the EDAM Proof of Concept charged for work that PG&E had not authorized due to ongoing transition in the Supply Chain department.

55.     In October and November, 2011, SURBEY was also asked to assist PG&E's regulatory and legal affairs departments with its upcoming General Rate Case submission to the PUC to

14

have the new GIS projects approved. Although it was not part of his job since he was a manager and not a technician, SURBEY's technical GIS knowledge and level of responsibility for meeting goals at PG&E placed him in a unique position to assist with the General Rate Case.

56.     SURBEY participated in regular meetings through November and December 2011 to help PG&E prepare testimony for its upcoming General Rate Case before the PUC, which included new plans for overhauling the GIS programs. During this process, SURBEY became increasingly concerned about the efficacy of the new plan, PG&E's grossly negligent implementation of the old plan, and ultimately that the regulatory affairs and legal affairs departments were using the information he was providing to potentially mislead the PUC, the general public, and the shareholders of the company.

57.     This presentation SURBEY reviewed was designed to explain the differences between the GD Asset Management plans in the 2008 rate case and the planned 2012 rate case. SURBEY told regulatory and legal affairs that there were relatively few differences between the rate cases; almost everything requested in the earlier GRC had been included in the 2011 GRC. SURBEY also told them that the lofty plans justifying the rate cases were completely overblown and that they proposed technically impossible solutions to a serious problem. Eric Lichtblau told SURBEY, "Well, that's how we get funded."

58.     SURBEY, along with most employees working on GIS, knew that the $85 million Base GIS program approved in 2009 could not deliver a fully functioning overhaul of PG&E's GIS, which was what PG&E was promising the public, the PUC, and PG&E shareholders.

59.     While reviewing PG&E's new proposal, SURBEY objected to the legal department and management that it too overstated the maturity of the technology and the lack of business processes to implement it, was misguided and substandard, offering superficial fixes to serious

15

data problems. Finally, SURBEY determined that the regulatory affairs and legal departments were using the information he had given them to find unnecessary budget additions, mainly new technology, that would justify the enormous jump in cost between 2008 and 2011.

60.　During this period SURBEY, based upon his knowledge and understanding of the internal GIS systems at PG&E, knew that the PUC would have no way of determining the appropriateness of the new plan requirements and that PG&E was using this to its advantage to obtain millions in rate increases from the PUC with little chance to complete viable solutions.

61.　During this period SURBEY became aware that while he was determined to deploy industry-leading GIS systems crucial to safety, PG&E was simply using the need for a GIS overhaul to request more money from the PUC with no intention of actually delivering an overhaul, instead spending the money elsewhere in a haphazard fashion. It became apparent to SURBEY through this process that PG&E was paying consultancy firms millions of dollars for technology and services that deliver no GIS solution, in turn justifying PG&E's future requirement for funding for GIS programs that lacked intent to deliver solutions and the real need was to have more internal staff develop GIS. It was in this light that SURBEY became suspicious and outraged about the budget irregularities and coverup that happened next.

62.　Having over 20 years of experience in the utility business, SURBEY was shocked at PG&E's substandard budgeting practices, which allowed PG&E to continue misleading the PUC and shareholders. In April 2011, SURBEY complained to Valerie Maloy, the previous Principal Project Manager for Base GIS that the way projects were authorized, tracked, and monitored lacked rigor.

63.　Defendants intended that the millions in increases sought in the proposed rate case before the PUC under the rubric of "GIS Systems" would create a series of funds used by Defendants to

16

further fund collusive contracts with outside consulting companies for sham solutions to PG&E's GIS data crisis.

64.     Shortly after voicing his objections to PG&E's new General Rate Case proposal, PG&E set out to professionally punish SURBEY's refusal to provide a technical justification of the a non-existent need to spend millions in consultancy contracts which could not remedy the endemic GIS deficiencies at PG&E.

65.     Shortly after voicing his opposition, PG&E began an internal blackballing process against SURBEY.  Even though other departments expressed a desperate need for SURBEY's expertise in deploying GIS solutions, SURBEY was denied transfers within the company.

66.     SURBEY applied for promotion to the Director position, whose job responsibilities he was already performing; however, he was denied the position in favor of Susan Martin, who was promoted through the revolving-door between PG&E and its consultants, from being an ESRI consultant to a PG&E Director, even though Martin had no electric or gas utility experience.

67.     In late November, 2011, Dickerson informed SURBEY that PG&E was not going to promote him to either the ED or GD GIS Director positions. Despite this, Dickerson informed SURBEY that SURBEY should remain at PG&E and not seek a position outside the company. Instead of promoting SURBEY, whose expertise and commitment had already been demonstrated with unprecedented success at PG&E, the company chose to hire from outside the company in keeping with a long-standing pattern and practice of facilitating collusive relationships between PG&E and Consultancies.  In keeping with the practice, PG&E hired Susan Martin, who had no hand on experience at large IOU electric and gas utilities.

68.     After Defendants hired Susan Martin, SURBEY's superiors and colleagues began to exclude him from budget meetings and contract negotiations in his own department.  SURBEY's

17

COMPLAINT

higher-level and lower level managers such as the Project Management Analyst began aligning with Martin and began to inappropriately involve themselves in decisions implicating him for 2012 budgets that had been provided by the IBM/ESRI team, displaying clear conflicts of interest in arranging multimillion dollar contracts to outside companies.

69.     SURBEY, as the project manager, was ultimately responsible for the budget but higher-ups at PG&E, including Martin, and the outside contractors were constantly rearranging the relevant details and intentionally excluding SURBEY from decisions and discussions concerning critical GIS projects.

70.     Defendants' lack of transparency with regard to its budgetary and spending processes is endemic, and has cost shareholder, taxpayers and ratepayers millions in squandered consultancy fees for the ill-fated "Business Transformation" debacle under previous CEO Peter Darbee and has been the subject of other Sarbanes-Oxley litigation, including *Paul v. PG&E,* USDC Northern District of California Case No. 3:09-cv-04751.

71.     In January 2012, PG&E signed the Electric Distribution Asset Management system integration contract with IBM after which the sourcing department realized that IBM's 15% travel adder was going to push the contract over the budget, in an amount of $6.5 million for the expected 3-year life of the contract.

72.     In early January, 2012, SURBEY told his supervisor that the resulting budget costs involved in the 2011 funding of GIS projects "should be investigated."

73.     In January 2012, PG&E employees and consultants excluded SURBEY from budget discussions and negotiations then began blaming him for the resulting mismatch between budget projections and negotiated numbers.

18

74.     After SURBEY's objections at the Special Rate Case discussions, the budget debacle at the end of 2011, and SURBEY's complaint to Dickerson that the budget should be investigated, PG&E knew that SURBEY was a threat to PG&E's pattern and practice of misrepresenting the company's GIS systems and plans to obtain millions in rate increases to fund Consultancies in serious conflicts of interest.

75.     Beginning in January 2012, PG&E embarked upon a systematic campaign to destroy SURBEY's career in retaliation for his complaints about its deceitful practices. This effort consisted of defamation of SURBEY to potential GIS employers. In each case SURBEY interviewed with the company and was promised a position, then the potential employer—a PG&E consultant—determined the risk was too great after learning SURBEY had been blacklisted by PG&E.

76.     In January 2012, SURBEY was invited to participate in a series of workshops on PG&E's Fiber Optics Management GIS project. Michael Tejada of the Telecomm Department expressed enthusiasm about SURBEY's participation and indicated he would like to offer SURBEY a position managing its GIS project. SURBEY was interested, but Dickerson and Tejada's manager spoke about the transfer and Dickerson refused to permit the transfer to go forward.

77.     In January 2012, SURBEY applied for a position at PG&E within the Gas Operations department leading the GIS efforts at the Pipeline Safety and Enhancement Program ("PSEP"), the program founded ostensibly to remediate the gas pipeline problems responsible for the San Bruno disaster. It was a lower level position than the SURBEY he held at the time, but SURBEY knew that Martin and Dickerson were upset with him for protesting their budget shadow play. On January 31, 2012, PG&E Human Resources told SURBEY that he was one of the selected applicants for the position in Gas Operations. SURBEY went to an interview in

19

COMPLAINT

Walnut Creek on February 3, 2012, where the interviewers questioned him about how he would leverage his GIS experience for the PSEP GIS. SURBEY was not selected for the position.

78.     Three days later, on February 6, 2012, Dickerson told SURBEY that his position was being eliminated in a one-person layoff because PG&E was assigning SURBEY's responsibilities to Martin and that she could not afford two Project Managers. SURBEY had applied for Martin's position in October 2011 and had been fulfilling the duties for months.

79.     After terminating his employment, Defendants have made false assertions of fact concerning SURBEY to other potential employers.

80.     On February 4, 2012, SURBEY spoke with a representative of Schneider Electric, a PG&E consulting company, about joining the organization. Several Schneider managers told SURBEY that he would be an excellent fit at Schneider and that SURBEY was perfect for a number of open positions. After a telephone interview, Schneider rapidly flew SURBEY in for another interview in Atlanta on February 14, 2012. The interviewers asked questions about his work at PG&E but were not concerned that he was looking to move after only a year. They indicated that they intended to hire SURBEY, reiterated that his skill set was ideal for several open positions at the company, and that their human resources department would be in contact. The next day, Schneider asked for SURBEY's references and, since the hiring process was moving forward, they contacted Dickerson and Martin pursuant to the discussion SURBEY had with the interviewers. Two days later, on February 16, SURBEY received an email from Schneider stating that it could not offer him a position because it was looking for a more junior-level employee.

81.     At this point, SURBEY became extremely concerned about the new pattern of job opportunities suddenly evaporating after his supervisors became involved. SURBEY finally

20

found a contract position at a Southern California utility company that had no business relationship with PG&E and began working there on April 16, 2012.

## FIRST CLAIM

### RETALIATION IN VIOLATION OF 18 U.S.C. §1514A, et. Seq.

82.     As a first, separate and distinct claim, Plaintiff complains of Defendants, and each of them, jointly and severally, and for a claim, alleges:

83.     PG&E's post-bankruptcy practice of providing utility services is wholly dependent on outside consultant work from all of the major technology companies and consultancies, including Accenture, Oracle, IBM and its subsidiary companies ESRI, Schneider, SAP, and UDC ("Consultancies").

84.     PG&E, in concert with Consultancies engage in a pattern and practice of making multimillion dollar contracts to supply services and technology that PG&E has endeavored to ensure that it cannot supply or maintain itself, but has done so in a fashion that is less than transparent to shareholders.

85.     Personnel transfer  between decision-making roles at PG&E and lucrative positions at Consultancies is so frequent and prevalent that it has become the norm in post-bankruptcy PG&E, and results in serious conflicts of interest which PG&E does not report, track, or otherwise monitor.

86.     Defendants' failure to monitor, track, or report potential conflicts of interests between PG&E and Consultancies has resulted in an endemic corporate culture of revolving-door employment and the creation and funding of contracts in a fashion to ensure that only Consultancies have the capacity to provide the services called for in the outside consulting contracts.

21

87.     Plaintiff SURBEY engaged in protected activity within the meaning of 18 U.S.C. §1514A(a) by causing information to be provided regarding misconduct by PG&E which Plaintiff reasonably believed to constitute a violation of 18 U.S.C. §1348 (Securities Fraud) and/or rules and regulations of the Securities Exchange Commission and/or federal law relating to fraud against shareholders to persons with supervisory authority over the Plaintiff and/or other persons within PG&E with the authority to investigate, discover, or terminate the misconduct.

88.     By the very fact that PG&E is a publicly-traded company, PG&E is required to comply with the requirements of SOX. Section 404 of SOX deals with requirements to maintain adequate internal control structures and procedures, which is where IT and GIS are most relevant.

89.     SURBEY reasonably believed that Defendants were engaging in contracting and budget practices that resulted in material misrepresentations about the crucial GIS program that materially affects the stock price of PG&E Corp..

90.     PG&E was actually or constructively aware that Plaintiff engaged in the protected activity.

91.     PG&E subjected Plaintiff to an adverse employment action in violation of SOX by summarily terminating his employment, and other adverse employment actions set forth above.

92.     The proximity in time between Plaintiff's protected activity and the adverse employment actions are sufficient to raise an inference that the protected activity was likely a contributing factor in the adverse employment action.

93.     In doing the acts and engaging in the conduct herein alleged, Defendants intended to and did vex, harass, annoy and cause Plaintiff to suffer emotional distress.

94.     Defendants committed the abusive actions alleged herein maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff and from an improper and evil

COMPLAINT

1  motive amounting to malice, and in conscious and reckless disregard of his rights as an

2  employee.

3  95. As a proximate result of Defendant's wrongful acts, Plaintiff has suffered and continues to

4  suffer substantial losses incurred in seeking substitute employment and in earnings, bonuses,

5  deferred compensation, stock options, seniority, and other employment benefits; and has suffered

6  and continues to suffer emotional distress in an amount according to proof at the time of trial.

7  WHEREFORE, Plaintiff has been damaged and prays judgment as set forth below.

8

9  **SECOND CLAIM**

10  **WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**

11  96.    As a second, separate and distinct claim, Plaintiff complains of Defendants, and each of

12  them, jointly and severally, and for a claim, alleges:

13  97. The factual allegations of Paragraphs 1 through 95 above, are re-alleged and    incorporated

14  herein by reference.

15  98. Jurisdiction is invoked pursuant to 28 U.S.C. § 1367.

16  99. Plaintiff's wrongful termination from his employment with Defendants was based upon

17  Defendant's violation of strong public policy, including but not limited to the following: the

18  fundamental public policies against retaliation as expressed in the Sarbanes-Oxley Act of 2002,

19  "SOX", and subsequent amendments thereto.

20  100.    In doing the acts and engaging in the conduct herein alleged, Defendants intended to and

21  did vex, harass, annoy and cause Plaintiff to suffer emotional distress.

22  101.    Defendants committed the abusive actions alleged herein maliciously, fraudulently, and

23  oppressively, with the wrongful intention of injuring Plaintiff and from an improper and evil

24  motive amounting to malice, and in conscious and reckless disregard of his rights as an

25  employee.

26  102. As a proximate result of Defendant's wrongful acts, Plaintiff has suffered and continues to

27  suffer substantial losses incurred in seeking substitute employment and in earnings, bonuses,

28

COMPLAINT

1  deferred compensation, stock options, seniority, and other employment benefits; and has suffered

2  and continues to suffer emotional distress in an amount according to proof at the time of trial.

WHEREFORE, Plaintiff has been damaged and prays judgment as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1. For general damages according to proof, however, no less than the jurisdictional limit of this court;

2. For damages due to reputational harm;

3. For special damages in amounts according to proof;

4. For attorneys' fees as provided by law;

5. For interest as provided by law;

6. For cost of suit incurred herein; and

7. For such other and further relief as the Court deems fair and just.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury of all matters so triable.


Dated: MAY 28, 2013                    SMITH PATTEN



                                        _____
                                          */s/ Dow W. Patten*
                                        DOW W. PATTEN
                                        Attorneys for CHRISTOPHER SURBEY


24

COMPLAINT